# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01506-COA

**AUGUSTA HUGHES**                                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/29/2018 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM TUCKER CARRINGTON |
| | SANDRA KAY LEVICK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 02/11/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    This is an appeal from an order of the Circuit Court of Lee County, Mississippi, denying Augusta Hughes's[1] motion for post-conviction collateral relief (PCR). Augusta sought a new trial based on newly discovered evidence relevant to the issue of his guilt and the State's failure to provide a material, potentially exculpatory statement given by a witness before trial. Augusta argues this evidence would have changed the outcome of his August 2000 trial on charges of armed robbery. Because the circuit court failed to address all the

---

[1] In his testimony, Augusta Hughes spelled his name for the court reporter as "Argusta." However, in all other proceedings, he is referred to as "Augusta," and we will do so as well.

issues and evidence presented, we reverse and remand this case for the court to reconsider its ruling consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.     On July 5, 1997, two men attempted to rob Andrew Hairston in the parking lot of the Sonic that Hairston managed in Nettleton, Mississippi. In February 1998, Augusta and Anthony Isby were indicted for armed robbery. Both were tried together in August 2000. Attorney Wayne Housely represented Augusta, and Attorney John Weddle represented Isby. Both men were found guilty, and Augusta was sentenced to serve twenty-five years in the custody of the Mississippi Department of Corrections. We affirmed Augusta's conviction, and the Mississippi Supreme Court denied Augusta's petition for writ of certiorari. *Hughes v. State*, 820 So. 2d 8, 12 (¶14) (Miss. Ct. App. 2002), *cert. denied*, 822 So. 2d 974 (Miss. 2002). On March 30, 2005, the supreme court denied Augusta's pro se "Motion for State Habeas Corpus."

¶3.     In August 2015, the Mississippi Innocence Project filed a PCR application on behalf of Augusta in the Mississippi Supreme Court. On May 17, 2017, the supreme court ruled that Augusta could present three of his claims to the circuit court: (1) newly discovered evidence; (2) the State's failure to disclose a key witness statement; and (3) ineffective assistance of counsel.

¶4.     On June 14, 2017, Augusta filed his PCR motion in the Circuit Court of Lee County. The motion contained numerous exhibits, including the transcript of Augusta's trial, as well as several affidavits. On July 23, 2018, the court held a hearing on Augusta's PCR motion.

2

On August 28, 2018, the court issued its order denying the motion. Because Augusta claims that his newly discovered evidence would have affected the outcome of his trial, a review of the facts presented at trial is needed.[2]

## A.    The Armed Robbery

¶5.    In the early morning hours of July 5, 1997, two men attempted to rob Andrew Hairston in the parking lot of the Sonic that Hairston managed in Nettleton, Mississippi. Hairston had closed for the evening and just deposited that day's take in the bank. As he returned to the Sonic, he saw one of his employees, Peggy Sue Jones, at a restaurant trying to use a pay phone. He offered to give her a ride home. They went back to the Sonic for Hairston to complete his paperwork. After he finished, he locked up, and they went to his pick-up truck. As Hairston was unlocking the truck's door, he heard a voice say, "Give me the money." Hairston turned and saw a black male at the rear of the truck and another man with a shotgun pointed at him. Hairston told the gunman that the money was at the bank, and he offered the gunman the keys to his truck.

¶6.    Jones was on the passenger side when she heard Hairston say something. She looked through the truck window and saw the man with the shotgun. The other man, who had been standing at the rear of the truck, "peeped" out at Jones. Then both men ran off. The whole incident lasted about forty seconds.

## B.    The Police Report and Investigation

¶7.    Hairston and Jones immediately went to the Nettleton Police Department to report

---

[2] Augusta attached the August 2000 trial transcript as an exhibit to his PCR motion.

what had happened. They spoke to Dispatcher John Edwards Sr., who took the information and prepared a "Field Complaint Report." The report listed the time of the offense as 00:30 and the time of the report as 00:33. The report says that the suspects were two black males wearing dark blue or black cut-off pants and blue bandanas over their faces. The report also stated that "Ms. Jones says she recognized one of the robbers from the projects while at a friend's house."

¶8. Several days later, on September 12, 1997, Officer Shane Young, who was investigating the case, remembered two individuals, Augusta and Isby, who had recently been arrested on another charge. Officer Young arranged for Hairston to visit the Monroe County Jail where Augusta and Isby were being held. Hairston saw the two men, who were alone in the library, and he identified them as the men who had tried to rob him. Later, Jones visited the jail and picked the two men out of a line-up. Both Hairston and Jones gave written statements that day. Augusta and Isby were ultimately charged with armed robbery.

### C.  The Trial and Direct Appeal

¶9. At the trial three years later in August 2000, the State called Officer Young, Hairston, and Jones to testify. While on the stand, Hairston testified that he knew Isby was involved, but he could not swear the other man was Augusta. Hairston was more focused on Isby, who was the one with the shotgun. Jones, however, said she was positive that both Augusta and Isby were involved. She also said there were no bandanas covering their faces.

¶10. Officer Young testified and said that on the night of the robbery, another officer had seen John Edwards Jr., the dispatcher's son, with a person named Gary Hughes. Both men

4

were walking down the street near the Sonic shortly after the robbery. Young, who was at home when he heard the radio traffic about the robbery, left and went toward the Sonic, which was near his home. He said that when he arrived, Officer Thomas Adams was speaking to Edwards Jr. and Gary. Officer Young also spoke to Edwards Jr. Officer Young said he did not suspect him of being involved because Edwards Jr. was not wearing the type of clothing that the victims had described.

¶11. The defendants did not testify but presented three alibi witnesses: Jackie Louise Walton, Sandrunette Isby and Mattie Walton. Jackie testified that she had a Fourth of July gathering at her house. Augusta and Isby arrived at 9:00 p.m. They all went to the liquor store at 10:00 p.m. Then they partied a while and left to go to "The Sticks," a club about fifteen minutes outside of Nettleton. Jackie drove Augusta, Isby, her sister Mattie, and Willie Crockett to the night club. They arrived at 11:00 p.m. and left around 2:30 a.m in the morning. She testified that Augusta Hughes and Isby were at the Sticks the whole time.

¶12. Sandrunette Isby testified that she arrived at The Sticks around 11:15 p.m. Augusta and Isby arrived no more than thirty minutes later. Sandrunette paid Isby's cover charge. All of them stayed at the club until 2:30 a.m. Mattie testified that she was in the group at Jackie's house and rode with the others, including Augusta and Isby, to The Sticks. They all stayed until 1:30 or 2:00 a.m.

¶13. On this evidence, the jury convicted both Augusta and Isby of armed robbery, and the court sentenced them to serve twenty-five years in prison.

### D. The Current Post-Conviction Proceeding

5

¶14. The George C. Cochran Innocence Project assisted Augusta with his latest PCR motion. After the supreme court granted Augusta leave to file this current PCR motion, the circuit court held an evidentiary hearing on July 23, 2018. Augusta contended that prior to his trial in 2000, the State had failed to produce exculpatory material, namely a statement that Hairston had made to the dispatcher on the night of the robbery. Allegedly, Hairston had said that the suspects were not "Hughes boys" because Hairston knew all the Hugheses. Augusta also contended that since the trial, he had discovered new evidence; namely, that Edwards Jr. had confessed to several family members that he, not Augusta, had committed the attempted robbery.[3]

¶15. On August 28, 2018, the court issued its ruling. The court said that after considering all the testimony and evidence submitted, it found the motion to be without merit and denied Augusta a new trial. The following is a summary of the testimony and evidence presented at the PCR hearing and the court's consideration of that evidence as reflected in its order.

### 1. Affidavit of Gary Hughes

¶16. Gary, Augusta's first cousin, was fifteen years old at the time of the attempted robbery in 1997. On January 12, 2015, when he was incarcerated at the Mississippi State Penitentiary,[4] Gary signed an affidavit concerning the events that night and other matters. In it, Gary said that on that night, he and another cousin Tony Hughes were outside James

---

[3] Augusta presented no evidence on the competency-of-counsel issue and has withdrawn that as a basis for his PCR motion.

[4] There was no information presented as to Gary's whereabouts at the time of Augusta's trial in 2000 or at the time of the hearing on the PCR motion.

Finney's pool hall in Nettleton when Officer Young came by. Officer Young stopped Gary and accused him of the robbery because Gary was wearing a blue bandana on his head. Finney came out of the pool hall and vouched for both Gary and Tony, telling the officer that they had been outside the pool hall for the past hour (during the time of the robbery).

¶17.   Gary asserted in his affidavit that after the police left, Edwards Jr. and his friend Robby Riley pulled up in a car owned by Riley's girlfriend, Jamie Jernigan. Gary and Tony got into the car, and they all planned to go to The Sticks. Gary was in the back seat where he saw a sawed-off shotgun. Gary asked Edwards Jr. and Riley where they had been that night. At first they said they had been to Arkansas, but later both men admitted they had not gone to Arkansas; instead, they had tried to rob the Sonic that night. Riley said the shotgun belonged to him.

¶18.   Gary also said that after Augusta was arrested, he (Gary) told Officer Young that Edwards Jr. and Riley had committed the crime.[5]

¶19.   The circuit court opinion makes no mention of this affidavit or any of its contents.

### 2. *Affidavit of John Edwards Sr.*

¶20.   In a December 21, 2015 affidavit, Edwards Sr. (the police dispatcher), said that on the night of the attempted robbery, he put out the description of the Sonic suspects as given to him by Hairston and Jones. An officer called Edwards Sr. to say that he had seen a couple

---

[5] Edward Jr. has a criminal record as well, including a ten-year sentence for the sale of cocaine and a concurrent twenty-year sentence, with ten years suspended, for a second sale-of-cocaine offense, both from June 2000. In 2017, Edwards, Jr. pleaded guilty to the possession of marijuana and received a term of three years to serve with two years suspended. Because of this possession of marijuana offense, the suspended portion of his 2000 conviction was revoked.

7

of the Hughes boys walking around. Hairston was still standing at Edwards's desk when the officer called. Edwards told Hairston what the officer said, and Hairston said, "It wasn't a Hughes—I know all of them." In fact, at one point in time, Hairston had employed Augusta's sister.

¶21. Edward Sr. also says in his affidavit that he was not sure if he put this remark made by Hairston in his report, "but I know that I told Shane Young (Officer Young) about it."

¶22. Edwards Sr. did not testify at the hearing.

¶23. The circuit court's opinion makes no mention of this affidavit or its contents.

### 3. Testimony of John Edwards Jr.

¶24. At the hearing, Augusta called Edwards Jr., who Augusta now contends attempted to rob the Sonic that night. After the court informed Edwards Jr. that he had a right to remain silent and the right to an attorney, Edwards Jr. declined to testify.

¶25. The circuit court opinion does note that Edwards Jr. invoked his right to counsel and did not testify.

### 4. Testimony of Benetrial Long

¶26. Benetrial Long testified that back in 1997 she heard Edwards Jr. and Riley plan the Sonic robbery. She was seventeen years old at the time, and she is the mother of a child fathered by Augusta. But she said she and Augusta were estranged at the time of the robbery, arrest, and trial. At the time of the trial in 2000, she said she had moved on with her life.

¶27. Long testified that at the time of the robbery, she lived across the street from her cousin Jamie Jernigan, who was dating Riley. On the Fourth of July in 1997, Long went to

8

Jernigan's house, and Edwards Jr. and Riley were there. Long said she heard them planning to rob the Sonic. She wanted no part of that and left.

¶28. Long also testified that later that evening, she went to The Sticks and saw Augusta and Isby. She arrived around 10:00 or 10:30 p.m., and she, Augusta, and Isby were all there until 2:00 a.m. She said no one had contacted her about the matter, and she had not followed Augusta's trial.

¶29. The circuit court found that Long was an alibi witness and that her testimony was cumulative and not newly discovered. The court found that her testimony would not have produced a different jury verdict. The court made no mention of Long's testimony of her overhearing of Edwards Jr. and Riley planning to rob the Sonic.

### 5. Testimony and Affidavit of Shemeka Hughes

¶30. In an affidavit signed on March 4, 2015, Shemeka Hughes identified herself as Augusta's sister. At the time of the attempted robbery in 1997, she was fourteen years old and lived with her grandparents. Edwards Jr. lived next door.

¶31. In her affidavit, Shameka said that not long after the Sonic robbery, Edwards Sr. came over to talk to her grandparents. She was there in a shed in the yard when this conversation occurred. Edwards Sr. said that he knew his son had committed the robbery and that it was not right that Augusta and Isby had been charged with the crime. Edwards Sr. said that he would talk to his son and that he would testify for Augusta about how Edwards Jr. was responsible. Shameka said this promise is why she did not go to the police herself.

¶32. She also said in her affidavit that Edwards Jr. came by on a different occasion prior

9

to trial when she was sitting on the porch. Edwards Jr. said that he was sorry that her brother was locked up for what he and Riley had done—specifically saying that they had tried to rob the Sonic but got no money. Shemeka told her grandmother what Edwards Jr. had said, and Edwards Jr. repeated the admission to the grandmother and apologized. Her grandmother ran Edwards Jr. off and told him not to come back. In her affidavit, Shameka said she had not spoken to Edwards Jr. since that time.

¶33. At the PCR hearing, Shameka testified about a recent contact she had with Edwards Jr. She said she was at a party at Billy's Pool Hall in November 2017. Edwards Jr. was there and offered her a bag of marijuana, which she declined. She testified that Edwards Jr. said that he knew she did not like him because of what went on with her brother. Then, he again confessed, "[M]e and Robby did the robbery." Edwards Jr. said that he hated that Augusta got in trouble for it.

¶34. The circuit court noted that Shameka testified to Edwards Jr.'s confessing to committing the crime. But the court found that she and the grandmother were available to testify at trial, and thus this information was not newly discovered evidence. The court added: "Further, John Edwards Jr. denied any alleged confession."[6] The court found that her testimony would not have produced a different jury verdict.

6. *Affidavit and Testimony of Amanda Hughes Graham*

[6] At the start of the hearing, Augusta's counsel informed the court that Edwards Jr. had recently been arrested. Augusta's counsel and an investigator from the district attorney's office had interviewed Edwards Jr. the day before. Edwards Jr. did not admit that he robbed the Sonic and said that he was also at The Sticks that night. Edwards Jr.'s statements to Augusta's counsel and the investigator in the interview were not given under oath, and when called to testify in court, Edwards Jr. invoked his right to remain silent.

¶35. Amanda Hughes Graham, another sister of Augusta, signed an affidavit and testified. She had worked at the Sonic in 1994 or 1995 when she was fourteen or fifteen years old. At the time of the robbery, she could have testified as an alibi witness because she too was at The Sticks that night. She arrived around 11:00 p.m and stayed until 2:00 a.m. She said her brother was there the whole time.

¶36. Amanda also testified that she talked to Edwards Jr. years later in 2014. At that time, Amanda was working full-time for the American Family Association and part-time at Dodge's Chicken Store. She testified that in January or February of 2014, Edwards Jr. came into the store to get a money order from Western Union to pay his probation fee. Edwards Jr. tried to strike up a conversation with her and asked her for Augusta's address so he could send him some money. Amanda was stunned and asked her supervisor to take over the cash register so she could talk more with Edwards Jr. She and Edwards Jr. moved over to the freezer area and talked for about ten minutes. Edwards Jr. told her that he knew everyone in the family hated him and that he knew it was his fault that Augusta would not be able to see his son's high school graduation. Amanda asked Edwards Jr. why he had not come forward long ago. Edwards Jr. replied that at first he did not think Augusta and Isby would be convicted for something they had not done and that then when he saw the sentence they received, he knew he could not do that kind of time. Soon after this conversation, Amanda signed an affidavit containing this information.

¶37. The circuit court found that Amanda's testimony as to Augusta's alibi was cumulative and not newly discovered evidence. The court also found that what Edwards Jr. told her at

the convenience store would be inadmissible hearsay. The court added; "Further, John Edwards Jr. denied any alleged confession." The court found Amanda's testimony would not have produced a different jury verdict.

### 7. Testimony and Affidavit of Patrick Verner

¶38. Patrick Verner testified that he was Amanda's supervisor at the convenience store in January or February 2014 and that he relieved her from duties at the register so she could speak to a man for about fifteen minutes. He also testified to Amanda's veracity and truthfulness.

¶39. The circuit court found that Verner did not identify who Amanda was speaking to or what they were talking about. The court found his testimony would not have produced a different jury verdict.

### 8. Testimony of William Wayne Housely Jr. (Augusta's Attorney)

¶40. Housely, Augusta's trial attorney, testified that he was never informed of the statement that Hairston made to Edwards Sr.—that it was not a Hughes who committed the attempted robbery—even though Housely made a *Brady* demand.[7] He testified that he petitioned the court for funds to hire an investigator named Herb Wells, who was very competent. Despite the investigation that was done, Housely did not know about Edwards Jr.'s potential involvement or any of the information that the other witnesses testified to. Therefore, his defense for Augusta was only an alibi defense.

¶41. The circuit court found that Housely testified that he presented his best case to the jury

---

[7] *Brady v. Maryland*, 373 U.S. 83, 87 (1963), established the obligation of the State to produce to a defendant any exculpatory evidence in its possession.

and his best defenses. Housely's testimony was not newly discovered evidence. The court found that his testimony would not have produced a different jury verdict.

### 9. Testimony of Augusta Hughes

¶42. Augusta testified that he was at Jackie Walton's house celebrating the Fourth of July in 1997. From there he went to The Sticks and stayed there until 2:00 or 2:30 a.m. He said he was innocent of the attempted robbery.

¶43. The circuit court found that Augusta waived his right to testify at trial and that his testimony was readily available back then, so it was not "newly discovered evidence."

## E. The Appeal of the PCR Ruling

¶44. Augusta appeals from the court's denial of his PCR motion. Augusta raises several errors allegedly made by the circuit court. Among them, Augusta argues the court failed to address the *Brady* violation issue and other evidence presented, and he contends the court's ruling that evidence of Edwards Jr.'s confessions would be inadmissible hearsay at a new trial was erroneous. Because of these alleged errors and others, Augusta argues that the denial of his PCR motion should be reversed.

## STANDARD OF REVIEW

¶45. When reviewing issues of law in an appeal from the denial of a PCR motion, this Court's proper standard of review is de novo. *Russell v. State*, 73 So. 3d 542, 544 (¶5) (Miss. Ct. App. 2011). When reviewing findings of fact in an appeal from the denial of a PCR motion, an appellate court "will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Van Norman v. State*, 114 So. 3d 799, 801 (¶8) (Miss. Ct.

13

App. 2013) (quoting *Collins v. State*, 975 So. 2d 219, 222 (¶8) (Miss. 2008)).

## DISCUSSION

¶46. The Supreme Court authorized Hughes to file his PCR motion signifying that he made a substantial showing that he has a viable claim. Considerable evidence in the form of affidavits, documents, and live testimony was presented to the court on two main issues: evidence of Edwards Jr.'s confessions to the crime and evidence of a potential *Brady* violation. In our review of the circuit court's opinion, we find that it erroneously concluded that testimony of Edwards Jr.'s confessions would be inadmissible at a new trial. Further, the court failed to address Hughes' issue of a *Brady* violation. Because the court is required under Mississippi law to address all issues, and because of its error in its ruling on the admissibility of Edwards Jr.'s confessions, we reverse and remand for further proceedings.

**I.      The court's failure to address issues and evidence presented warrants reversal.**

¶47. Mississippi Code Annotated section 99-39-5 (Rev. 2015) lists the bases under which a defendant may seek post-conviction relief. One is the discovery of new evidence, which the statute defines as "evidence, not reasonably discoverable at the time of trial which is of such nature that it would be practically conclusive that had such been introduced at trial, it would have caused a different result in the conviction or sentence[.]" § 99-39-5(2)(a)(i). If a defendant has previously been denied post-conviction relief, he may still file a subsequent petition if he alleges newly discovered evidence pursuant to Mississippi Code Annotated section 99-39-23(6) (Rev. 2015).

¶48. In determining whether to grant a PCR motion for which an evidentiary hearing is

14

required, the statute requires that the court "make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented." § 99-39-23(5). Even if a circuit court grants a PCR motion on the basis of some of the issues presented, its failure to address each issue presented amounts to reversible error. *Beal v. State*, 271 So. 3d 713, 715 (¶7) (Miss. Ct. App. 2018). In that case, Beal was convicted of the sale of cocaine and the court sentenced him to serve sixty years as a habitual offender without eligibility for parole and to pay a $2,000,000 fine. *Id*. at 713 (¶1). Beal's habitual offender status was based in part on a prior conviction for bribery. *Id*. at (¶2). The bribery conviction was later reversed by the supreme court, and Beal filed for post-conviction relief regarding his sentencing on the cocaine conviction. *Id.* In re-sentencing proceedings, Beal also sought a proportionality review. *Id*. at 713-15 (¶¶2, 7). The circuit court held a re-sentencing hearing and removed the habitual offender enhancement. *Id.* at 713-14 (¶2). The court re-sentenced him to the same sentence of sixty years' imprisonment and reduced the fine but made no mention of parole or other relief. *Id.* at 714 (¶2). Beal appealed, and we reversed the circuit court's ruling. *Id.* at 714 (¶7). Citing section 99-39-23(5) and emphasizing its requirement that the court make findings on all issues, we held that the court had not addressed Beal's third issue—specifically his request to receive a proportionality review. *Id.* We found this failure constituted reversible error. *Id*.

¶49. In this case, Augusta sought a new trial and raised two issues to support his request: (1) the newly discovered evidence of Edwards Jr.'s confessions and (2) the failure of the State to provide Hairston's pre-trial, potentially exculpatory witness statement in violation

of *Brady v. Maryland*, 373 U.S. 83 (1963). We find that the court did not deal with all the facts presented and failed to address Hughes's *Brady* violation at all, warranting reversal and remand.

### A. Court's Failure to Consider the Brady Violation Issue

¶50. The court failed to address the issue of the *Brady* violation. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that due process requires the government to disclose favorable, material evidence not otherwise discoverable through due diligence. The government's duty under *Brady* extends to evidence impeaching the credibility of government witnesses. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). A *Brady* suppression occurs when prosecutors fail to turn over evidence known to the government or police investigators. *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.")).

¶51. The suppression of evidence includes evidence used for impeachment purposes. In *Roberson v. State*, No. 2014-KA-00652-COA, 2017 WL 3872182, at *19 (¶97) (Miss. Ct. App. Sept. 5, 2017), we said:

> The suppression of favorable evidence is a violation of the defendant's due process rights. Favorable evidence includes that which is either directly exculpatory or items which can be used for impeachment purposes. *Manning v State*, 929 So. 2d 885, 890-91 (¶13) (Miss. 2006)

¶52. It is important for the circuit court in this case to address the *Brady* violation issue because a defendant is not required to demonstrate that disclosure of the suppressed evidence

16

would have ultimately resulted in the defendant's acquittal, as is required when the court considers newly discovered evidence. In *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), the United State Supreme Court said:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression" undermines confidence in the outcome of the trial."

*Id*. (quoting *United States v. Bagley*, 473 U.S. 667, 473 (1985)). In *Smith v. State*, 500 So. 2d 973, 979 (Miss. 1986), the Mississippi Supreme Court said that when considering *Brady* violations, "the trial judge should not focus narrowly on the probable effect of the evidence upon the jury. He should take into account all the relevant facts including any impairment upon the defense's decision making process, either prior to or during trial."

¶53. In the case at hand, Augusta presented the affidavit of Edwards Sr. to establish that Hairston had told him that the perpetrators were not any of the Hughes boys. Edwards Sr. also said that even if he failed to put this in the official report, he told Officer Young what Hairston had said. Thus, the statement was apparently known by police investigators and should have been disclosed. Prosecutors must learn of any favorable evidence others operating on the government's part, like police, might have. *Strickler v. Green*, 527 U.S. 263, 280-81 (1991). Augusta's trial attorney, Housely, testified that he was not informed of Hairston's statement that "it was not a Hughes." The State put on no evidence to rebut this testimony. On remand, the court should address the evidence presented and its conclusions of law concerning this alleged *Brady* violation.

## B. Omissions and Erroneous Findings of Fact

¶54. In its opinion, the court addressed some of the proof presented on the issue of newly discovered evidence, but not all. The court dealt with testimony of Edwards Jr.'s pre-trial confessions to family members, finding it was not newly discovered evidence. But the court did not discuss the affidavit testimony[8] of Gary, who said that he and Tony met Edwards Jr. the night of the incident and that he saw the sawed-off shotgun that Edwards Jr. admitted to using when he and Riley robbed the Sonic. The court also did not discuss that portion of Long's testimony wherein she said she overheard Edwards Jr. and Riley plan the Sonic robbery.[9] Gary's and Long's testimony is separate and distinct from testimony concerning Edwards Jr's pre-trial confessions to Shameka and her grandparents and should be addressed by the court.

---

[8] The use of affidavits is permitted in post-conviction proceedings pursuant to Mississippi Code Annotated section 99-39-23(4) and was allowed in *Tobias v. State*, 584 So. 2d 1276, 1278 (Miss. 1991).

[9] Augusta argues that Long's testimony of overhearing Edwards Jr.'s conversation in which he was planning the robbery is admissible under Mississippi Rule of Evidence 803(3):

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

M.R.E. 803(3). "[S]tatements which indicate intention to do something in the future are admissible to prove that the act intended took place." M.R.E. 803(3) advisory committee notes. "Statements which indicate an intent or plan to do something in the future are admissible to prove that the proposed act occurred." *Bogan v. State*, 754 So. 2d 1289, 1293 (¶14) (Miss. Ct. App. 2000).

¶55.     In weighing the evidence, the court also erroneously found that Edwards Jr. had denied robbing the Sonic.  The court had been informed that prior to the hearing, Augusta's attorney and an investigator from the district attorney's office had interviewed Edwards Jr.  In that conversation Edwards Jr. claimed to have been at The Sticks that night.  But Edwards Jr.'s comments in the interview were not given under oath.  On the stand, Edwards declined to testify to anything.  Therefore, the court should not have found as a fact that Edwards Jr. denied robbing the Sonic.

**II.      The testimony of Edwards Jr.'s confessions is admissible evidence.**

¶56.     In its opinion, the court repeatedly and erroneously stated that testimony of Edward's Jr.'s confessions to the crime would be inadmissible hearsay at a new trial.  But the evidence of Edwards Jr.'s confessions would be admissible under Rule 804(a) of the Mississippi Rules of Evidence as a statement against his penal interest.  On remand, the court shall factor this into its analysis.

¶57.     Rule 804 excepts from the bar of hearsay testimony that was given by a declarant who is unavailable and that meets other criteria.  Rule 804(a)(1) provides that an unavailable witness includes one who "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies."  As our supreme court held in *Hartfield v. State*, 161 So. 3d 125, 131 (¶12) (Miss. 2015), this first requirement is met and a declarant is unavailable when he invokes his rights under the Fifth Amendment not to testify.  *See also Williams v. State*, 174 So. 3d 275, 280-81 (¶27) (Miss. Ct. App. 2014).  In this case, Edwards Jr. was called to testify at the PCR hearing and invoked his

19

right to remain silent. Thus, he was unavailable to testify, and his alleged confessions would be admissible if they met the criteria found in Rule 804(b)(3).

¶58.    Under Rule 804(b)(3), the statement of an unavailable witness is admissible if it is a "statement against interest," meaning a statement that

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it tends to expose the declarant to criminal liability and is offered to exculpate the accused.

Edwards Jr.'s confession to the crime does satisfy subpart (A) of Rule 804(b)(3) because it is clearly probative of the issue of his potential guilt and is against Edwards's penal interest. *Edmonds v. State*, 955 So. 2d 787, 796 (¶20) (Miss. 2007).

¶59.    The next consideration for the admission of Edwards Jr.'s confessions is whether corroborating circumstances indicate their trustworthiness. Courts have considered the following factors in assessing reliability: "[w]hether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts." *Williams*, 174 So. 3d at 280 (¶25) (quoting *Lacy v. State*, 700 So. 2d 602, 607 (¶17) (Miss. 1997)). The corroboration requirement required by Rule 804(b)(3)(B) need not be "absolute," and "the sufficiency of the corroboration must be

assessed in light of the importance of the evidence and the offeror's fundamental constitutional right to present evidence[.]" *Williams*, 174 So. 3d at 281 (¶28). For example, in *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007), thirteen-year-old Tyler Edmonds was indicted for capital murder for killing Joey Fulgham, his sister Kristi's husband. *Id*. at 790 (¶4). Danny Edmonds was Tyler and Kristi's father. *Id.* at (¶3). Danny gave a statement to law enforcement that Kristi had asked him for a pistol and that she wanted Joey dead. *Id*. at 793 (¶12). She said she would kill him in his sleep. *Id.* She also told Danny that Joey had a life insurance that she would get if he were dead. *Id.* At Tyler's trial, the circuit court ruled that Danny's testimony about these statements Kristi made was inadmissible hearsay. *Id.* The Mississippi Supreme Court disagreed. *Id.* at 795 (¶20). It found that Danny's testimony was sufficiently trustworthy because Danny was both Kristi and Tyler's father. *Id.* at (¶21). "Surely, he had a significant reason not to inculpate Kristi, and it is reasonable to assume that he would not testify that she made the statements unless she really did make the statements." *Id.* at 796 (¶21). Other corroboration included the fact that Joey's body was found in bed, as if he had been shot in his sleep, and that Kristi had made inquiries to the National Guard about Joey's life insurance. *Id*. at 796-97 (¶22).

¶60. In the case at hand, the State argues that the testimony of Edwards Jr.'s confession was not independently corroborated. However, it is undisputed that Edwards Jr. was found in the vicinity of the Sonic that night shortly after the time of the robbery, so he, not Augusta, may have been the one who committed the crime. It is significant that Edwards Jr. allegedly confessed, not only at the time of the robbery (to fourteen-year-old Shameka and her

21

grandparent, and to fifteen-year-old Gary), but twice after the conviction (in 2014, to thirty-four-year-old Amanda in the convenience store, and in 2017, to Shameka who was thirty-four years old when he approached her at a party). Augusta also provided Verner's affidavit to establish Amanda's reputation for truthfulness and the fact that she met with someone under circumstances consistent with Amanda's testimony. It is logical that the alleged confessions were made to family members. In essence, Edwards Jr. was apologizing for what he had done (something that affected the whole family). When Augusta was going to miss his son's high school graduation, Edwards Jr. allegedly apologized to the next most logical person, Augusta's sister. Both Shameka and Amanda testified in detail about their encounters with Edwards Jr. Their conversations went beyond his alleged assertion that he had committed the crime. To Amanda, he expressed regret about Augusta not being able to see his son graduate. Shameka described Edwards Jr.'s behavior in approaching her and explaining that he understood why she and the family did not like him. There was further conversation between Edwards Jr. and both witnesses. While Edwards Jr.'s alleged confessions would be stronger if they were documented in some written form, not all evidence needs be documented. We find that there was sufficient corroboration of Edwards Jr.'s confessions to meet the criteria of Rule 804(b)(3). Accordingly, we find that the circuit court erred as a matter of law and that Edwards Jr.'s confessions, as statements against his penal interest, would be admissible at a new trial.

## CONCLUSION

¶61. We reverse the circuit court's denial of Augusta's PCR motion and remand it for

reconsideration consistent with the rulings above. On remand, the court should consider all evidence and issues raised, and, in its discretion, the court may choose to reopen and rehear the matter anew before it renders its final opinion.

¶62. **REVERSED AND REMANDED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL AND C. WILSON, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., NOT PARTICIPATING.**